**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAMES D. FOWLER,      )
            )
    Plaintiff,    )
            )  No. 08 C 02785
   v.       )
            )
UNITED STATES OF AMERICA,  )  Judge John J. Tharp, Jr.
            )
    Defendant.   )

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, James D. Fowler, filed this lawsuit alleging negligence by the United States Postal Service ("USPS") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, seeking to recover damages for injuries that he allegedly sustained while making a delivery to the Libertyville Post Office on November 16, 2005. The case proceeded to a four-day bench trial in April 2013, at which the Court heard testimony from Fowler and several witnesses. The parties subsequently submitted their proposed findings of fact and conclusions of law. Here, the Court sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court's factual findings are based on the stipulations and submissions of the parties, documentary evidence, and testimony presented at trial, at which the Court had the opportunity to observe and evaluate the credibility of the witnesses. On the basis of the findings of fact and conclusions of law set forth in the discussion below, the Court enters judgment for the defendant.

# I. FINDINGS OF FACT

## A.      Factual Background

James D. Fowler was employed as a truck driver by Eagle Express Lines ("Eagle Express"), a contractor of the USPS. Tr. 247:20-248:5; 248:20-22. His duties included driving trailers containing mail from the USPS Processing and Distribution Center in Palatine, Illinois, to various local post offices, including the Libertyville Post Office, where he unloaded various pieces of equipment containing mail from his trailer onto post office loading docks. Tr. 248:1-4, 20-22; 250:12-16; 251:4-9; 251:20-252:7; 253:3-11; 254:6-255:23; 256:12-257:7. Fowler was very familiar with the Libertyville loading ramp and dock; he had delivered mail to the Libertyville Post Office many times throughout his tenure as a driver for Eagle Express and had made at least seven deliveries to Libertyville in the two months preceding the delivery at issue in this case. Tr. 101:13-104:6; 259:1-10; Ex. 23.

The configuration of the dock area at each post office varies somewhat, but each has a landing pad on which tractor trailers park and a dock a few feet above the landing pad designed to create a level transition between the trailer bed and the dock. Tr. 124:19-125:25. Bumpers on the docks create gaps between the dock and trailer bed; a dock leveler (also called a dock plate) bridges this gap to create a smooth transition that enables people to roll equipment off the trailer onto the dock (and vice versa). Tr. 165:24-166:10. The dock leveler typically consists of hinged steel plates that are connected to a mechanism that sits in an opening, or "pit," in the dock. When there is no trailer being unloaded, the dock plate of the leveler sits flush with the surface of the dock; a second, "lip," plate, sits in a vertical position aligned with the face of the dock wall on

which the bumpers are attached. Tr. 165:17-23; 173:16-22; 175:14-21; 178:3-6. When a trailer is to be unloaded, the leveler mechanism is raised by releasing a chain. Tr. 165:17-23; 178:2-180:2. This causes the end of the deck plate to rise and the lip plate to flip up from its vertical position at the front of the dock leveler to a horizontal position above the level of the bed of the trailer; the dock leveler is then "walked down" (*i.e.*, lowered) back to dock level (the weight of the driver depresses the plate back down to the dock level—*see, e.g.*, Ex. 19 at Kress 1821), with a few inches of the lip plate extending to sit inside and on top of the trailer bed. Tr. 179:24-180:2; Ex. 19 at Kress 1829, 1830, 1851, 1853-55, 1859. The Libertyville Post Office dock area includes a concrete landing pad on which trucks park and a Serco mechanical dock leveler installed on the dock. Ex. 18, 19, 21; Tr. 173:16-22; 407:7-8; 414:9-11. The dock leveler is six feet wide. Tr. 227:21-228:3.

The lip plate is generally intended to sit flush across the back end of a trailer bed, but the dock leveler at the Libertyville Post Office sometimes sits so that there is a small gap between the leveler and the back edge of the trailer bed on the passenger side of trucks parked at the dock, while the leveler is flush on the driver side of the trailer bed. Tr. 44:5-13; 79:7-13; 94:5-17; 166:8-10; 192:2-18; 355:17-356:23; 357:13-358:16, 367:16-369:22; Ex. 29. When a gap occurs, it gradually narrows from the passenger to driver side of the trailer bed. Tr. 423:10-20. The gap is caused by a cross slope in the concrete landing pad (that is, a slope from the driver's side of the ramp to the passenger's side). Tr. 182:16-183:3; 431:2-24. The degree of the cross slope at the Libertyville ramp varies at different distances from the loading ramp; the cross slope causes the trailer bed to slope from side to side as well, though the rear of the trailer bed does not slope to the same degree as the ramp. Tr. 182:2-183:21; 192:9-18; 211:12-23; 213:14-216:23; 229:7-

11; 414:20-25; 430:10-13. Factors such as the composition and length of the trailer, temperature, and how well the trailer is centered within the landing ramp effect the size of the gap created by the cross slope on the landing pad. Tr. 187:2-11; 216:13-23; 224:10-24; 225:4-229:20; 420:21-421:7; 428:22-430:5; 431:3-24.

In addition, the dock plate at the Libertyville Post Office also occasionally pops up or drifts upward while being used to unload materials. Tr. 49:1-8; 92:13-24; 95:12-24; 113:8-18; 119:1-9, 19-23. This condition occurs when the brake mechanism that holds the plate in position needs an adjustment, most frequently in the winter. Tr. 333:15-22; 351:15-352:22; 357:4-359:23. Even when the dock plate was operating properly, there was some give in the mechanism and the dock plate would depress about an inch as loads went across it before returning to its original position. Tr. 339:16-18; 352:6-14. If the mechanism was out of adjustment, however, the brake might not catch at the same point and the plate could drift up somewhat. *Id.* John Studer, the building maintenance supervisor at the Libertyville Post Office, testified that the most upward drift he had seen was about two inches.

Mr. Studer is responsible for maintenance of the dock area, including doing inspections, replacing lights bulbs, and maintaining the dock leveler. Tr. 342:19-343:14; 345:25-346:7; 351:12-14; 353:23-355:16; 371:2-372:14. The Libertyville dock area is illuminated by six overhead lights. Tr. 353:23-354:5. The light from these overhead lights reaches inside the ends of the trailer beds when trucks are parked at the dock. Tr. 260:18-22, 263:4-8, 264:4-8. An articulating spotlight is also installed on the dock; it serves to illuminate the inside of the trailers parked at the dock. Tr. 353:23-354:5; 399:1-9. It can be turned on by a switch accessible to both USPS workers and truck drivers making deliveries. Tr. 62:16-24; 354:6-12. Studer monitors the

lighting for maintenance needs in addition to personally operating the dock leveler regularly and performing regular maintenance on it. Tr. 335:20-336:7; 345:25-346:7; 349:10-351:14; 353:23-355:16; 371:2-372:14; Ex. 21. He also responds to reports of operational issues with the dock leveler. Tr. 352:19-353:22; 359:8-23; 371:-371:6.

The Libertyville Post Office typically receives eleven or twelve mail deliveries each day, Monday through Saturday. Tr. 365:4-6; 374:14-17. Other than the incident involving James Fowler, no one has ever reported being injured as a result of tripping over the dock leveler. Tr. 356:17-357:12; 372:15-373:15. The Postmaster at the Libertyville Post Office testified that just two complaints regarding the dock area have been filed: one in the summer of 2007 and one filed in relation to this case in October 2007. Tr. 367:4-7. The first time that Studer was alerted to complaints about the dock plate not sitting flush with trailers was in 2007, when a safety inspector visited the dock area in relation to the injury at issue in this case. Tr. 355:21-356:3; 359:24-360:11. Investigation revealed a gap of less than an inch between the dock plate and the need for some maintenance of the dock ramp, which Studer performed. Tr. 368:2-370:9.

### B.      Fowler's November 16, 2005, Delivery to Libertyville

On November 16, 2005, James Fowler made a mail delivery trip to the Libertyville Post Office. After beginning his shift at about 11 p.m., as was typical, he arrived at the Libertyville Post Office sometime around midnight with a 45-foot trailer. Tr. 259:12-260:5. The Eagle Express trailers that dock at the Libertyville Post Office are typically 40-foot or 45-foot trailers of varying brands. Tr. 24:25-3; 79:14-16; 428:22-429:24; Ex. 18. The Eagle Express unload process at Libertyville is expected to take ten minutes; in his testimony, Fowler called the schedule "strict," referred to the unload process a "hurry-up, rush thing," and testified that he

was aware that some drivers had previously been disciplined for not maintaining their schedule. Tr. 96:16-97:1-15; 117:1-118:18; 252:14-18; 260:6-14; 261:20-24.

Upon arriving at the Libertyville Post Office on November 16, 2005, Fowler got out of his truck, unlocked his trailer, rang the bell to announce his arrival, and released the chain on the dock leveler. Tr. 259:12-260:5. The articulating spotlight was not lit and may not have been working. Tr. 127:8-16; 304:9-12; 341:3-342:3; 355:3-10. Fowler did not ask anyone to try to turn the light on. Tr. 261:20-24.[1] Although the spotlight was not lit, the dock overhead lights were working and lit; their light reached one to two feet inside the trailer. Tr. 260:18-25; 263:1-8; 264:4-10; 304:9-12; 306:12-16. Fowler typically carried a flashlight in order to check his vehicle before and after delivery trips, but did not use it to see inside his trailer at the Libertyville Post Office. Tr. 271:13-272:1.

Fowler made fifteen to twenty trips on and off the trailer, moving pieces of rolling equipment off the truck by pushing them over the dock plate and onto the dock without incident. Tr. 270:17-271:2; 273:9-14; 303:19-304:8. As he rolled containers off the truck, he noticed "a popping kind of sound," Tr. 271:7, but the dock plate lip appeared to be flush with the back of the trailer and he did not observe any gap between the leveler plate and the truck bed. Tr. 271:3-6; 274:1-5.

---

[1] Although he never testified unequivocally that he tried to turn the light on before he began to unload his trailer, that was the import of Fowler's testimony on direct examination. *See* Tr. 260:15-25; 263:2-3. Though somewhat ambiguous, Fowler's testimony during his deposition (which was presented at trial during his cross-examination) suggested that he did not attempt to turn the spotlight on until after he had unloaded and was locking his trailer back up in preparation to leave. Tr. 304:18–305:25.

As Fowler was using a manual pallet jack to move a pallet of bulk mail off the trailer, he tripped and was injured. Tr. 265:22-266:19; 268:7-22; 308:3-9; Ex. 19 at Kress 1832. The evidence that Mr. Fowler presented at trial, however, does not provide a clear or consistent description of how the injury occurred, and Fowler effectively acknowledged that he did not have a clear understanding of what happened. *See* Tr. 278:7 ("All I can do is assume what I think happened."). Mr. Fowler testified that as he walked the pallet jack off the trailer, he was closer to the passenger side of the trailer in order to keep the pallet from drifting toward that side of the trailer. He testified variously that:

- "my toe hit the—the dock plate wasn't sitting flush to the trailer bed floor, and my foot hit that raised dock plate, and I stumbled" (Tr. 269:13-17);
- "my foot went under there, and I got it out right away, but I had already been in the process of falling over at that point" (Tr. 269:21-23);
- "I tripped over the dock plate" (Tr. 280:13); and
- his foot slid under the dock lip and "came up right away in the process of falling" (Tr. 283:23–284:2).

Fowler also testified that the gap between the lip plate and the trailer bed was large enough for his boot to fit under the plate, a distance he estimated to be about two inches. Tr. 277:4-10.

Further compounding the ambiguity as to what caused Fowler to trip, Fowler's supervisor, Dave Richards, testified that Fowler called him about the accident later that night, Tr. 86:21-87:10; 106:24-107:5; 279:10-21, and the version Richards recounted hearing from Fowler was significantly different. Richards testified that Fowler reported that the dock leveler had popped up as he was moving the pallet, causing the lip to fall back to its stowed, vertical, position, and creating an unbridged gap between the back of the trailer and the dock. Fowler told

Richards that the mail went in between the trailer and the folded dock plate, and that he fell into that gap as well, with his leg going all the way into the gap. Tr. 92:4-12; 106:6-19; 309:11-310:9; 327:11-15. Although Fowler's counsel called Richards as a witness, Fowler disputed Richard's testimony about what Fowler had told him. Tr. 309:21-22; 327:5-15.

Fowler testified that when he tripped, he fell forward and struck his left knee on the dock plate. He also testified that his left arm struck the trailer, resulting in a bleeding laceration. Tr. 278:25-279:2; 311:20-25. A postal employee and a supervisor on duty helped Fowler clean the cut on his arm afterward. Tr. 278:22-24, 279:3-9. Fowler did not, however, tell the postal personnel that there was an unsafe gap between the dock plate and the trailer, or that the dock plate had unexpectedly "popped up"; Fowler recalled only that he told them that "I tripped over the dock plate," Tr. 280:9-16, and that "I got a cut here and I fell and hurt my knee." Tr. 279:6-7. Fowler then went on to finish unloading the trailer. Tr. 329:10-22. He confirmed that he did not inspect the dock plate after his fall, Tr. 308:25–309:1, and did not testify that he had to take any corrective action to fix the problem with the dock plate in order to finish unloading the truck. After unloading the remaining items at Libertyville, Fowler resumed and completed his shift that night, making additional deliveries to other post offices. Tr. 279:11-23; 280:17-21.

## C. Conditions at the Libertyville Post Office and Related Expert Testimony

Both parties hired engineering experts to inspect, analyze, and explain the conditions at the Libertyville Post Office that the plaintiff alleges contributed to his accident. Fowler introduced the expert opinion of R. Kevin Smith, an engineering consultant with bachelor's and master's degrees in mechanical and aerospace engineering, respectively, from the Illinois Institute of Technology. Ex. 12. Smith reviewed the deposition testimony of the witnesses and

performed an inspection of the Libertyville Post Office dock area in July 2009. Tr. 170:9-171:25; 205:2-22. Smith took photos and video of the dock area and measured the cross slope of the concrete landing pad. Tr. 171:10-21; 205:18-207:5. Smith measured a 4% slope approximately 45 feet from the dock face that goes downhill from right to left when facing the dock from the parking lot. Ex. 15; Tr. 182:1-183:21; 216:5-23. During his roughly two-hour inspection, he did not observe any trucks docking at the Post Office nor did he observe any truck drivers operate the dock plate. Tr. 185:2-9; 202:25-204:3.

In an effort to illustrate the effects of the loading ramp cross slope on a trailer, Smith's assistant Jeff Groff, an associate engineer, built model ramps to simulate the 4% slope. Groff drove two different 53-foot tractor-trailer combinations onto the ramps and then measured the resulting slope at the back of the trailers. Ex. 16; Tr. 216:24-217:11. Groff measured resulting differences of 1.2% and 0.7%. Ex. 16. No photos or videos of Groff's tests were taken. Tr. 222:7-15. Smith testified on direct that a gap of "1 to 2 inches just based on the lateral [cross] slope would be likely," Tr. 192:16-18, but on cross examination he acknowledged that his calculations were based on the entire width of the trailer and that, when based on the actual width of the dock leveler (6 feet), his tests suggested gaps of one-half to three-quarters of an inch on the low side of the ramp. Tr. 224:10-229:3. Smith opined that such a gap would create an unreasonable risk of harm because it was a dangerous trip hazard. Tr. 198:13-199:5. He also testified that the dock plate "popping" that was described by some would contribute to unsafe conditions and could explain a gap of two to three inches between the lip of the dock plate and one side of the trailer bed. Tr. 192:19-193:22; 199:6-20. Smith also opined that the dock area of the Libertyville Post Office as unsafe because the lighting was inadequate. Tr. 200:25-201:24. At

no point, however, did Smith observe the Libertyville Post Office dock area at night. Tr. 231:20-22; 232:14-20.[2]

The United States introduced the expert opinion of Dr. Tyler Kress, a biomechanical engineer and professor at the University of Tennessee and Virginia Polytechnic Institute and State University. Ex. 17; Tr. 379:21-382:5. Dr. Kress has a Ph.D. in industrial engineering and human factors engineering from the University of Tennessee. Ex. 17; Tr. 379:21-384:18. Dr. Kress reviewed the deposition testimony of the witnesses as well as all of the documents produced in the case. Tr. 397:12-398:1. He also inspected the Libertyville Post Office dock area one late afternoon and early evening during December 2009, taking notes and photographs. Tr. 397:2-403:18; Ex. 19. Kress, who had the benefit of having observed the Libertyville dock area at night, opined that the lighting at the Libertyville Post Office was adequate. Tr. 401:22-402:24. He explained that he observed two drivers unloading trailers at night without trouble, despite the fact that they were not using the spotlight as intended. Ex. 19 at Kress 1905, 1915, 1958; Tr.

---

[2] Smith also opined that the combination of an inclined ramp and use of manual pallet jacks created an unreasonably dangerous situation because "you're going to be pretty much struggling . . . to keep that under control as you're coming down the hill out of the trailer." Tr. 195:17-20. The Court does not find this opinion testimony reliable or credible. Mr. Smith provided no foundation to offer an opinion that a pallet would be difficult to control coming out of a truck at the Libertyville post office. Apart from the fact that he observed no trailers being unloaded at Libertyville, Mr. Smith made no measurements (there is no evidence of what the incline of the ramp is), conducted no tests, and provided no calculations by which the Court might assess the credibility of his opinion. Moreover, the probative worth of that opinion is undermined by the photographs offered by Dr. Kress, which show a driver offloading a sizeable pallet with a manual pallet jack; the driver is pulling the pallet off the truck with one hand on the handle; the pallet is centered as it comes off the trailer, and the driver clearly is not having to "struggle" with the load. *See* Ex. 19 at Kress 1830-32. Fowler acknowledged during his direct testimony that Kress 1832 was representative of what he was doing at the time he was injured. Tr. 266:10-16; 269:1-5 ("I would be pulling it out just exactly like that fellow is there.").

10

401:6-21. Kress also observed tractor-trailers of varying sizes, including three with 45-foot Eagle Express trailers (the type that Fowler drove to Libertyville the night he was injured), dock for delivery. Tr. 402:25-431:2; Ex. 18; Ex. 19. Kress observed the lip plate sitting "pretty flush" with the bed of each truck. Tr. 416:12-431:2. He measured gaps between the lip plate and trailer bed of between one-half and three-quarters of an inch on the passenger side of the trailer. *Id.* He observed smaller gaps in trailers that were centered on the dock plate when backed up to the dock. *Id.* On the basis of this inspection, Kress concluded that the Libertyville dock area was reasonably safe and that the conditions present were to be expected in that kind of environment. Tr. 431:3-434:12. He stated that it would be "unusual" to have a dock plate that is "always flush or perfectly flush," and that the dock plate at Libertyville did not create a trip hazard that was either uncommon or unreasonable. Tr. 432:2-7. Kress did not address the issue of the upward drift of the dock plate. Tr. 461:5-21.

### D. Fowler's Medical History, Treatment, and Related Expert Testimony

At the time of the incident at the Libertyville Post Office, Fowler was 61 years old. He was not generally in good health. He was morbidly obese; he suffered from chronic obstructive lung disease, diabetes, hypertension, and sleep apnea, and had shoulder problems, lumbar problems, and, most relevant to the issues in this case, advanced osteoarthritis in both of his knees.[3] *See, e.g.*, Tr. 313:1-320:5; 517:21-519:13, 530:5-10; 554:10-19; 558:20-22; 559:13-15; 561:12-562:2; Ex. 1 at Concentra 8, 29-47; Ex. 3 at Fox 54, 67, 70, 77; Ex. 5 at Schwager 60-63; Ex. 9 at Zoellick 44-56; Ex. 11 at Liberty 107. Osteoarthritis is a degenerative condition that

---

[3] Fowler has experienced knee problems dating back to a football injury in high school. Tr. 288:17-20; 483:23-25; 513:8-10; 516:13-517:17.

progresses slowly at first, but can progress rapidly as it gets more severe or following severe trauma. Tr. 568:2-569:7. Factors like age, obesity, overuse, repetitive movement, genetics, muscle weakness, and prior injuries can cause or exacerbate osteoarthritis symptoms. Tr. 529:23-532; 554:20-555:4; 568:2-569:7.

On November 16, 2005, Fowler visited his family physician, Dr. Verne Schwager.[4] Tr. 287:21-288:16; 318:18-319:20, Ex. 5 at Schwager 60-63. He brought MRIs of his knees that had been taken in October 2004 to show his medical history; he also reported worsening knee pain since his fall at the Libertyville Post Office in the very early hours of that day. *Id.* Based on his examination of the MRIs taken two years earlier, Dr. Schwager told Fowler that he likely needed a knee replacement and referred him to an orthopedic specialist, Dr. Spiros Stamelos. Tr. 287:14-15; 319:17-20. The next day, the disability coordinator for Eagle Express, Ron Wolterink, sent Fowler to Concentra Occupational Health after learning of his fall at Libertyville. Tr. 145:18-146:12; 280:22-25; Ex. 1 at Concentra 4. At Concentra, Fowler complained that his knee pain rated 9 out of 10. *Id.* Concentra physicians diagnosed Fowler as having a left knee contusion and noted that he had a history of chronic bilateral knee pain. Ex. 1 at Concentra 4-7, 55-56, 57-59. Fowler was prescribed medication and a knee brace, and directed to modify his work regimen. Ex. 1 at Concentra 57-59.

Fowler did not work the evening of November 17 due to his knee pain. Tr. 94:18-95:1; 280:19-21. He remained off work for approximately seven weeks. Tr. 146:22-25; 151:9-152:1-3; 281:1-16; Ex. 1 at Concentra 14-18, 51-98, Ex. 24 at 2. This absence was approved because the

---

[4] Fowler was not certain whether this was a preexisting appointment or he made it because he was in pain due to his fall at Libertyville. Tr. 327:18–328:11.

level of pain he reported that he was experiencing rendered him unable to perform his job duties. Tr. 156:12-157:8. In subsequent visits to Concentra, Fowler reported that he had a history of trouble with his knees and that his primary care physician had previously advised him that he may need a knee replacement. Ex. 1 at Concentra 19-22, 55-56. He also reported that his knee pain had been recurring for years, coming and going about four to five times per year, and reaching a pain rating of 8 or 9 out of 10. Ex. 1 at Concentra 19. During his absence from work, Fowler also saw an orthopedic surgeon, Dr. Charles Mercier, multiple times. Ex. 1 at Concentra 14-18. Dr. Mercier gave Fowler hydrocortisone injections to reduce pain. Ex. 1 at Concentra 14, 17. Dr. Mercier noted that Fowler had a history of knee pain prior to the Libertyville incident and had previously been advised that he was a candidate for knee surgery. Ex. 1 at Concentra 14, 17.

In January 2006, Fowler returned to work after having been approved by his doctors and employer. Ex. 1 at Concentra 18; Ex. 24 at 2; Tr. 146:24-147:15; 156:12-157:8; 281:1-16; 284:3-22. After returning to work, Fowler took Tylenol to manage his pain, as he had done on a daily basis before the accident at Libertyville. Tr. 98:1-19; 284:23-285:18; 291:12-20. In October 2006, Fowler contacted disability coordinator Wolterink to report that his knee was worsening and that he could not continue working. Tr. 152:11-16; 284:23-285:18. Wolterink referred him to Horton Occupational Health; Fowler subsequently saw Dr. Bruce Horton, Dr. Spiros Stalemos, and Dr. David Zoellick. Tr. 152:11-25; 286:1-18; 287:3-5; Ex. 6 at Horton 1-2; Ex. 7 at Stamelos 1. Dr. Horton took x-rays, examined Fowler's left knee, and concluded that a knee replacement might be necessary. *See, e.g.*, Ex. 6 at Horton 1-2. Dr. Horton's records indicate that Fowler had a work-related injury to his left knee. *Id.* Fowler saw Dr. Stalemos, an orthopedic surgeon, on November 1, 2006; he concluded that Fowler needed a left knee replacement and that Fowler

would also need a right knee replacement due to bilateral knee disease. Ex. 7 at Stamelos 1; Tr. 287:3-18. Dr. Stamelos opined that Fowler's right knee problem stemmed from overuse in light of Fowler's trouble ambulating. Ex. 7 at Stamelos 1.

Fowler also saw Dr. Zoellick, who had previously treated him in 2002 for a left knee injury. In 2002, x-rays ordered by Dr. Zoellick showed (the doctor concluded) "a little bit of arthritis" in Fowler's left knee; the knee was treated at that time with a cortisone injection. Tr. 477:23-478:16; 480:2-21; 515:15-16; 516:7-17; 524:15-16; Ex. 9 at Zoellick 44-56.[5] In 2006, Dr. Zoellick received Fowler's October 2004 MRI reports, which showed (in Zoellick's opinion) "significant" arthritis in both of his knees. Tr. 485:7-486:15; 488:13-489:3. Zoellick ordered additional x-rays in November 2006, and he concluded that those x-rays showed severe arthritis in Fowler's left knee. Tr. 491:8-493:2. Dr. Zoellick concluded that Fowler was a candidate for total knee replacement. *See, e.g.*, Ex. 9 at Zoellick 69-70. At trial, Dr. Zoellick opined that Fowler's left knee osteoarthritis was aggravated by his November 2005 fall, *see* Ex. 9 at Zoellick 70; Tr. 477:15-22, and opined that falling directly onto an arthritic knee can accelerate the onset of severe, bone-on-bone, osteoarthritis. Tr. 493:4-8. He testified that his opinion was buttressed in this regard by his view that Fowler had significant arthritis in both of his knees by 2004, but it is only on the knee on which he fell that he has required a knee replacement. Tr. 505:1-18. Dr. Zoellick acknowledged, however, that he had not reviewed Fowler's complete medical history, including any medical records, reports, or films taken immediately following the November 2005 injury. *See* Tr. 508:14-24; 513:21-522:7; 540:10-12. Dr. Zoellick also conceded that he could not

---

[5] Dr. Zoellick acknowledged on cross-examination that Fowler had been diagnosed with osteoarthritis as early as 1999. Tr. 526:2-5.

testify to a reasonable degree of medical certainty that, but for the November 2005 injury, Fowler would not have needed a total knee replacement. Tr. 534:1-6.[6]

Dr. Zoellick performed a total knee replacement surgery on Fowler in January 2007. Ex. 8. Fowler underwent physical therapy and had to have his knee drained following surgery. Tr. 495:22-496:24. He also had left knee pain and swelling after the surgery. Tr. 497:1-13. Fowler again returned to work in May 2007, initially with some restrictions on his lifting, pushing, and pulling. Tr. 153:10-15; 497:9-21; 498:5-9. Later in 2007, Fowler reported to Zoellick that he had experienced "setbacks" at work in the form of increased pain. Tr. 498:18-500:12. Fowler continued working through this pain, which Zoellick attributed to his increased activity level. *Id.* Fowler worked until he retired at age 65 in April 2009. Tr. 294:10-22. Dr. Zoellick testified that Fowler "was doing fairly well" in early 2009, when he last examined Fowler, and that he would not expect the condition of Mr. Fowler's left knee to have deteriorated significantly between 2009 and the present. Tr. 509:2-9. Mr. Fowler, however, maintains that his activities and mobility are now significantly limited by his pain. Tr. 294:23-25; 295:6-10; 296:3-25; 297:10-25; 299:5-301:7.

The United States presented the expert testimony of Dr. Henry Finn, a board-certified orthopedic surgeon, professor at the University of Chicago, and the inventor of the Finn knee, a

---

[6] Although he acknowledged on cross-examination that he could not opine that Fowler's knee replacement was necessitated by his fall at the Libertyville post office, Dr. Zoellick testified on direct (in response to a series of leading questions by plaintiff's counsel) that all of his opinions were "held to a reasonable degree of medical and orthopedic certainty," Tr. 475:23–476:1, and that all of his treatment of Fowler from 2006 forward was "necessary as a result" of that fall, Tr. 477:3-7. This substantial inconsistency undermines the Court's confidence in Dr. Zoellick's testimony generally.

type of prosthetic knee that has been recognized by the American Academy of Orthopedic Surgeons "as one of the greatest advances in the field of orthopedics" over the past 75 years. Ex. 20; Tr. 546:16-552:20. Dr. Finn treats patients with osteoarthritis and has performed more than 10,000 knee replacement surgeries. Tr. 547:22-548:9; 552:8-20. Dr. Finn explained that the treatment of arthritic knees usually progresses from physical therapy and anti-inflammatory medications to injections of cortisone or artificial joint fluid. Tr. 559:16-560:12; 570:13-23; 599:2-600:2. Total knee replacement is an elective surgery. Tr. 600:3-601:22. A patient's decision to get total knee replacement surgery is often informed by a combination of personal and financial considerations. Tr. 605:13-606:5.

Dr. Finn reviewed Fowler's medical records and original x-rays dating from 1999 and 2009, as well as the depositions and pleadings in this case. Tr. 552:24-553:23. Dr. Finn opined that Fowler's November 2005 x-rays shows that his arthritis had already become severe by the time of his injury in Libertyville. Tr. 561:12-565:19. It is Dr. Finn's opinion that after falling at the Libertyville Post Office, Fowler experienced a minor soft tissue contusion that temporarily aggravated his preexisting arthritis symptoms, but that his left knee contusion did not accelerate the progression of his arthritis, nor was his need in 2007 for a knee replacement causally linked to the November 2005 injury. Tr. 560:13-566:1; 568:24-569:7; 572:1-12; 574:16-576:3; 601:6-22; 603:15-604:6; 605:23-606:5.

The Court finds Dr. Finn's opinions reliable and persuasive. Dr. Finn acknowledged that trauma, such as a fracture or "a really violent, significant injury to preexisting normal cartilage," can accelerate the progression of osteoarthritis, Tr. 590:15-17, but noted that there is no evidence of bone trauma, such as a fracture, evident on the x-rays taken of Fowler's knee right after the

fall in November 2005 or in those ordered by Dr. Zoellick a year later.[7] Dr. Finn observed (as Dr. Zoellick could not, because he did not review the 2005 x-rays) that there was no substantial difference in the condition of Mr. Fowler's knee in 2005 and 2006. Tr. 573:1-25. He also noted that Mr. Fowler's arthritis was primarily lateral, while his injury from the fall was primarily anterior and medial, further indicating that the fall "had nothing to do with any progression of arthritis." Tr. 575:12-16. Mr. Fowler's post-accident recovery, and the fact that he returned to work and sought no further treatment for his knee over the next year were, in Dr. Finn's opinion, also inconsistent with a conclusion that the fall caused a trauma-induced progression in Mr. Fowler's arthritis. Tr. 572:1-22. Dr. Finn expressly rejected the notion that it can be inferred from Mr. Fowler's decision to have his left knee replaced that his fall on that knee in 2005 accelerated the progression of osteoarthritis in that knee, noting that it is not uncommon for equally arthritic knees to cause varying degrees of pain, Tr. 602:23–603:14, that knee replacement surgery is "completely elective," Tr. 600:21-22, and that a wide variety of factors other than the condition of the knee influence patient decisions concerning knee replacement surgery, including their lifestyles and financial considerations, Tr. 605:13-22.

## II. CONCLUSIONS OF LAW AND APPLICATION OF FACTS TO LAW

### A. Applicable Legal Standards

This case arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), which effects a limited waiver of sovereign immunity for the United States to provide a remedy for personal injury caused by the negligent or wrongful acts of U.S. government employees

---

[7] Dr. Zoellick acknowledged the lack of evidence of bone trauma in the 2006 x-rays. Tr. 511:5-21. He did not view the 2005 x-rays.

acting within their scope of employment. In an FTCA action, the government is liable "in the same manner and to the same extent as a private individual under like circumstances," "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346, 2674. The alleged negligence in this case occurred in Illinois, therefore Illinois law governs this case. *See Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003); *Noble v. United States*, 231 F.3d 352, 356 (7th Cir. 2000).

While agreeing that Illinois law applies, the parties each propose that different standards under Illinois law should govern this action. Fowler suggests that he need only establish what a plaintiff needs to prove to prevail on an ordinary negligence claim: "that the defendant owed a duty to plaintiff, that defendant breached that duty, and that the breach proximately caused injury to plaintiff." *See Grillo v. Yeager Const.*, 387 Ill. App. 3d 577, 590, 900 N.E.2d 1249, 1263 (Ill. App. Ct. 2008). The government argues that the court should additionally apply the Illinois Local Government Tort Immunity Act ("Tort Immunity Act"), 745 Ill. Comp. Stat. 10/3-102(a), which shields a "local public entity" from liability "unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." If this Court were to apply the statute to his negligence claim, Fowler would need to have proven that he was owed a duty of care by the United States, that a breach of this duty proximately caused his injuries, and that the United States had actual or constructive notice of the allegedly unsafe condition in time to correct it. *See, e.g.*, *Demichele v. United States*, 06 C 6294, 2008 WL 3855073, at *4 (N.D. Ill. Aug. 19, 2008) (applying the Illinois Local Government Tort Immunity Act to an FTCA action in which the plaintiff claimed that she sustained injuries at a post office).

18

The government also argues that Fowler has the burden of proving actual or constructive notice under a premises liability theory of the case. *See Mueller v. Phar-Mor, Inc.*, 336 Ill. App. 3d 659, 666, 784 N.E.2d 226, 231 (Ill. App. Ct. 2000) (citing the elements of a premises liability claim as set forth in *Jordan v. National Steel Corp.*, 183 Ill.2d 448, 454, 701 N.E.2d 1092 (Ill. 1998)).

Despite the statutory language rendering government liability in FTCA cases coextensive with that of a "private individual," 28 U.S.C. § 2674, the common practice in this circuit seems to be for courts to apply the Tort Immunity Act to the United States in FTCA actions because it is a public entity, albeit not a "local" one. *See, e.g.*, *Cooks v. United States*, 815 F.2d 34, 35 (7th Cir. 1987) (noting the agreement of the parties that "the liability of the United States with respect to defects in its sidewalks is the same as the liability of a municipality located in Illinois"); *Nieves v. United States*, 980 F. Supp. 1295, 1296 (N.D. Ill. 1997); *Stewart v. United States*, 918 F. Supp. 224, 226 (N.D. Ill. 1996); *Demichele*, 2008 WL 3855073, at *4; *Perrott v. United States*, 96 C 4347, 2001 WL 873017, at *4 (N.D. Ill. Aug. 2, 2001); *Scardina v. United States*, 99 C 4968, 2001 WL 967515, at *4 (N.D. Ill. Aug. 22, 2001). The issue, however, remains open in this circuit. *Cf. Kaniff*, 351 F.3d at 790 ("Although we do not need to reach the issue . . . , we note that this court has never held that state immunity rules set the standard to be applied to the federal government in an FTCA suit."). Contrary to the government's contention, in *Cooks*, the Seventh Circuit noted only that the parties there *agreed* that the Tort Immunity Act applied to the United States; the court did not purport to decide the issue. *See Cooks*, 815 F.2d at 35.

Although there is reason to question the applicability of the Tort Immunity Act in view of the FTCA's language stating that the government's liability should match that of a private individual (not that of a public entity), it is not necessary to consider the question further in this

case. Whether or not the Tort Immunity Act applies, Fowler failed to prove a critical element of his claim under any theory: that the conditions at the Libertyville Post Office presented an unreasonable danger. He has therefore failed to establish that the government breached its duty.

### B. Conditions Posing an Unreasonable Risk of Harm

In a premises liability action, the plaintiff must prove six elements: "(1) the existence of a condition that presents an unreasonable risk of harm to persons on the premises; (2) that the defendants knew, or should have known, that the condition posed an unreasonable risk of harm; (3) that the defendants should have anticipated that individuals on the premises would fail to discover or recognize the danger or otherwise fail to protect themselves against it; (4) a negligent act or omission on the part of the defendant; (5) an injury suffered by the plaintiff; and (6) that the condition of the property was a proximate cause of the injury to the plaintiff." *Mueller*, 336 Ill. App. 3d at 666, 784 N.E.2d at 231 (citing *Jordan*, 183 Ill.2d at 454, 701 N.E.2d at 1094). In support of the first element, Fowler introduced evidence of three alleged conditions at the Libertyville Post Office that he claims presented an unreasonable risk of harm: a non-working spotlight intended to illuminate the interior of tractor trailers making deliveries to the loading dock, a cross slope of the landing pad that causes a gap between the lip of the dock plate and the passenger side of a tractor trailer parked at the loading dock, and a condition by which the dock plate would drift or pop up off the trailer bed. He further claims that the downhill slope of the landing pad causes heavy equipment to roll toward the end of the truck, and that the brakeless hand trucks combined with the compressed ten-minute window in which he was to unload the truck combined to make a risky environment. The Court concludes, however, that these

conditions did not present an unreasonable risk of harm in the dynamic environment of the Libertyville post office loading dock.

The Court concludes that the lack of a spotlight did not contribute to Fowler's fall, for several reasons. First, Fowler fell at the end of the truck bed, in the area closest to the dock itself. The overhead lights, which were lit during Fowler's delivery, reached this area of the trailer and about two feet inside the trailer bed. Tr. 260:18-25; 263:1-8; 264:4-10; 304:9-12; 306:12-16. Kress, the government's expert who had the opportunity to observe the area during nighttime deliveries made by similar trucks to that driven by Fowler, credibly testified that the overhead lighting was sufficient and safe. Tr. 400:6-402:24. By contrast, Mr. Smith, the plaintiff's expert, offered an opinion that the lighting on the dock was inadequate without ever having viewed the dock lighting at night (and which the Court, accordingly, finds unreliable). Second, Fowler affirmatively attributed the cause of his accident to a gap between the dock lip and the trailer bed, not to an inability to see adequately.[8] He did not mention the spotlight being out when he reported the accident to Richards. Tr. 106:20-23. Nor did he ask about the spotlight during the course of his delivery that night. Tr. 261:20-22 ("Well, you don't have time to negotiate, you know, with any frivolous stuff. If it don't work, it doesn't work."). And third, Fowler did nothing to improve the lighting in the truck. In this regard, the Court finds that Mr. Fowler's deposition testimony on this issue—in which he acknowledged that he did not try to turn the light on until

---

[8] Fowler's statements regarding the lighting on the dock varied substantially. He told medical staff at Concentra that he tripped because he couldn't see, *see* Ex. 1 at Concentra 3, but the lighting did not consistently figure in to Fowler's explanations, *see* Ex. 1 at Concentra 4, and he plainly conceded on the stand that the overhead lights of the dock area reached at least two feet into the trailer, *see* Tr. 264:4-10. Moreover, he did not complain at all about the lighting on the dock when he reported his accident to Richards later that night.

he was preparing to lock up his trailer and leave the Libertyville post office—is more credible than his trial testimony. Mr. Fowler did not answer direct questions put to him at trial on this subject; rather, he obfuscated. *See, e.g.*, Tr. 304:9-17. Moreover, his deposition took place in 2009, some four years before he testified at trial. Mr. Fowler did not attempt to compensate for the lack of the spotlight by using his flashlight to see inside his truck, to identify the mail containers on the trailer, or to inspect the dock plate—facts that strongly suggests that he found the lighting adequate for purposes of unloading. Tr. 36; 38:21-39:3; 271:13-272:1; 273:1-8. The conclusion that follows is that the non-functioning spotlight did not present an unreasonable risk by itself or in combination with the other conditions of the dock; it did not contribute to his fall.

While it seems clear that Fowler tripped on the dock plate, it is far from clear what caused him to do so. This is largely because, as noted above, the only witness to the event—Fowler himself—did not provide clear or consistent testimony about what happened. Fowler acknowledged that he did not see the dock plate as he was moving the pallet, Tr. 274:1-17, and admitted that he did not inspect the gap after he fell, Tr. 308:20-309:1, so he was unable to provide any evidence regarding the position of the leveler other than an "eyeball estimate" based on the boots he was wearing at the time rather than the alleged gap. That estimate was not particularly reliable, particularly since he inconsistently testified both that he tripped because his toe hit the dock lip plate and that the entire toe of his boot slid underneath the plate. The latter version would likely have required a gap even larger than the two inches, but the former could have occurred even had there been no gap at all. As Fowler's expert, Mr. Smith, acknowledged, the lip of the dock plate itself has width, Tr. 230:4-12; Fowler could have tripped on the lip plate when the sole of his boot contacted it, even if the plate had been flush to the trailer bed. And

because, so far as his testimony establishes, Mr. Fowler never saw a gap between the dock plate and the trailer bed, either before, during, or after his fall, his own observations do not suffice to establish that there was any gap, much less one of two inches or more.

In lieu of his own observation, Fowler offers two theories to support his claim that there was an unreasonable gap between the plate and the trailer that caused him to trip. The first is that there was an unreasonably large gap as a result of the cross slope of the landing pad on which his truck was parked. The principal problem with this theory is that it is inconsistent with Fowler's own testimony. He testified that the lip plate "appeared flush" to the bed of the trailer, Tr. 271:3-6, and that he did not "notice that dock lip being off the ground of the trailer at all" prior to his fall, Tr. 274:1-5. That testimony is consistent with the fact that Fowler made many trips across the dock plate without trouble immediately prior to his fall. Fowler had already unloaded between fifteen to twenty pieces of equipment from his truck before he tripped. Tr. 270:17-23. In his first thirty to forty trips back and forth over the dock plate, his movement was not impeded by any gap. Tr. 270:20-271:2. Fowler expressly acknowledged that he did not "encounter any difficulties with the dock plate" in moving any of the loads prior to his fall, Tr. 270:20-23, and that concession effectively rebuts any claim that there was a significant gap caused by the cross slope of the loading ramp.

The evidence also established that the cross slope of the loading ramp did not cause gaps of several inches. The most reliable testimony on the size of the variable cross slope gap came from Dr. Kress, who observed deliveries being made by trucks like the one Fowler drove. Kress observed, measured, and photographed the dock plate mechanism as it was used in the course of unloading six different trucks; his measurements were recorded in his notes and photographs

introduced into evidence. *See* Exs. 18 and 19. By Kress's measurements, the distance from the trailer bed to the lip plate on the passenger side of the trailer for the six trucks unloaded measured between one-sixteenth of an inch and one inch, most falling between one-half and three-quarters of an inch. Ex. 18; Tr. 429:1-430:5.[9] Three of the six trailers were 45-foot Eagle Express trailers (the size of trailer that Fowler was unloading at Libertyville) and the gaps as to those trailers were one-half to three-quarters of an inch. Observation of the size of these gaps by photographs confirms that the gaps were not substantial, do not appear to pose an unreasonable trip hazard, and were certainly not large enough to slide the entire toe of a work boot under.

The tests conducted by Fowler's expert, Mr. Smith, corroborate the inference to be drawn from Dr. Kress's observations and measurements, namely that any gap attributable to the cross slope of the loading ramp was minimal and less than an inch. Those tests were of minimal probative value, as they did not account for numerous variables that might affect the creation and size of a gap: they did not duplicate the entire loading ramp; they were conducted at a different time of year; they involved trailers that were not the same size of the trailer Fowler unloaded the night of his accident; there is no information about whether the trailers were loaded at the time of the test, or what there weights were; and only two trailers were tested. Nevertheless, to the extent they showed anything, Mr. Smith's tests suggested that gaps of one-half to three-quarters of an

---

[9] One of the larger measurements that Kress observed in conjunction with forty-five-foot trailers—a gap that was three-quarters of an inch wide—occurred when the truck was not centered to the loading dock by the driver who parked it there. Tr. 429:14-18. A variable gap nearing one inch in width would thus not be attributable solely to the cross slope, but would be partially attributable to the driver, too.

inch might occur as a result of a 4% cross slope. Tr. 227:17–229:3. That result is consistent with Dr. Kress's observations and measurements.

The second theory that Fowler asserts to account for a large gap between the lip plate and the trailer bed is that the dock plate popped up while he was unloading, creating an unreasonably large gap. This theory has the virtue of greater consistency with Fowler's reports that the dock plate elevated unexpectedly and the fact that Fowler took fifteen to twenty loads off the truck without incident before tripping. Any gap caused by the static slope of the landing pad would not have appeared suddenly, Tr. 430:14-25, and a gap of two inches would have hindered, if not prevented, him from unloading, Tr. 185:20-186:7; 431:3-24. Fowler's reports of a sudden gap, moreover, are consistent with his testimony that he heard popping sounds as he unloaded the truck and with how his own expert, Smith, characterized the "drifting" or "popping" issue that might occur as the trailer was unloaded due to slippage of the friction brake mechanism. Tr. 180:15-181:22. The maintenance manager of the facility, John Studer, also confirmed that the friction brake needed occasional adjustment when the dock plate would begin to "creep" or "drift" up after weight was removed from it. Tr. 338:18-25.

That the dock plate *could* have elevated unexpectedly after Fowler's prior trips over the plate, however, does not establish that it did so. And in this regard, it is again Mr. Fowler's own testimony—both what he said and did not say—that leaves him short. As noted, Fowler did not testify consistently that his foot slid under the dock plate and his inconsistency on this point makes it difficult to conclude that a gap of several inches between the trailer bed and the plate materialized suddenly. But it is also what Mr. Fowler did not see, say, or do, that discredits his assessment that there was a substantial gap between the dock plate and the trailer bed. If the dock

plate elevated unexpectedly, creating a gap of some two inches between the dock plate and the trailer bed, it is difficult to imagine that Mr. Fowler would not have observed that gap at some point after it was created. If he was paying any attention to the dock plate as he unloaded the pallet, it is difficult to imagine that he would not have seen a gap big enough to stick his boot into, but it is even less likely that, after tripping, falling, and striking his knee on it, he would not have at least *looked* at the dock plate to identify the problem. This is particularly the case because Fowler's shift did not end with his fall; he proceeded to finish unloading more items off of his truck and across the dock plate after he fell. An unreasonably large gap would have impeded his movement as he wheeled these final items over the dock plate. *Cf.* Tr. 196:17-197:1; 436:19-437:9; 442:20 (discussing how items could be wheeled off delivery trucks over small gaps). Yet Fowler finished unloading his shipment without taking any action to restore the dock plate to its flush position. Thus, his own testimony establishes that even after his fall, he completed his delivery at Libertyville without having noticed, adjusted, fixed, or reported anything about the dock plate at Libertyville—a condition he now posits was unreasonably hazardous. This chronology yields an inference that is almost inescapable: Fowler did, and said, nothing to address the problem because there was none.

Put more precisely, the Court concludes that Fowler did not establish the existence of an unreasonably hazardous gap by a preponderance of the evidence. The evidence presented at trial does not adequately establish either that the dock plate "popped up" unexpectedly or that the cross slope of the loading ramp created a gap that presented an unreasonable trip hazard. At most, the evidence established that there was likely a gap of between a half and three quarters of an inch at the passenger side of the ramp. While one could certainly trip on a gap of this size

26

(just as one can trip while walking on flat ground), the Court concludes that a gap of that size would not pose an unreasonable risk of harm in this dynamic work area where vehicles and equipment are regularly moved, adjusted, and used in slightly varying alignments. *See, e.g.*, Tr. 393:3-9; 432:2-13 (explaining that people can trip on dock plates, which are usually not exactly flush, but that such conditions are to be expected in this kind of environment).

Fowler also cites the downhill slope of the trailer and the fact that the equipment he was unloading was "pushing" him in support of his contention that the conditions were unsafe, but the downhill slope of a truck in delivery is a normal condition at many loading docks and is not unreasonable *per se* (and Fowler presented no evidence that the slope was unreasonably large). Tr. 44:16-45:2; 174:3-4; 459:7-13; Ex. 19 at Kress 1825. Further, as the Court noted above (in note 2), the Court does not find the opinions on this question offered by Fowler's expert, Mr. Smith, to be persuasive.

It also bears noting that Fowler's complaint that he did not have time even to look at his surroundings, while of dubious credibility (it would take only a second to glance at the alignment of the dock lip plate prior to rolling dozens of carts and pallets across it), suggests if taken as true that he was rushing and not paying adequate attention to his environment. He indicated that he would unload the pallet just like the person pictured in Ex. 19 at Kress 1832, but later indicated that he would have had to use two hands to guide the equipment. Tr. 266:10-267:25; 269:4-11; 272:21-24. If that is true, then it seems unlikely that Fowler would have been facing forward as was the person pictured. And even if he did not look at the dock plate while unloading because his attention was on moving a heavy piece of equipment downhill, he could have looked at the end of the trailer, which was illuminated by the overhead lights, *before* he began to move the

item. Contrary to what he intends, Fowler's argument and testimony reveal that he may bear some fault for his accident.

Finally, the Court's conclusion that the dock conditions at Libertyville did not pose an unreasonable hazard is buttressed by the fact that, other than Fowler's injury, no one has been injured by tripping over the dock leveler at the Libertyville post office. Tr. 356:17-357:12; 372:15-373:15. The evidence established that there were typically eleven deliveries a day, six days a week, at Libertyville. Fowler testified that his truck was fully loaded and that he made about twenty trips off and on the trailer while unloading it. That combination means that a typical week would involve some 1300 loads across the dock leveler without incident, and some 66,000 loads successfully come off trailers at Libertyville in a year—and this particular dock had been in operation for years. While not dispositive, this extremely low rate of accident is consistent with the Court's finding that the dock area was reasonably safe; it would also be probative of whether the government had notice as required for a premises liability claim, though it is unnecessary to decide that issue is this case.

For all of the foregoing reasons, the Court finds that the conditions at the Libertyville Post Office did not present an unreasonable risk of danger, a required element of a premises liability claim. Similarly, Fowler failed to show that the Libertyville Post Office dock area was not a safe place to work because the conditions he complains of were not unreasonably risky; he accordingly has failed to prove an ordinary negligence claim premised on the government's breach of its duty to provide a safe place to work for its contractors. Fowler is therefore not entitled to judgment in his favor.

## C. Causation

Even if the conditions at Libertyville had been unreasonably hazardous and he were entitled to some recovery, Fowler would not be entitled to recover most of the damages he seeks because he did not prove a causal connection between his fall and the progression of his osteoarthritis or his need for a knee replacement. The plaintiff has the burden to prove by a preponderance of the evidence that the defendant caused the harm of which he complains. *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 232, 560 N.E.2d 324, 328 (1990); *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 29, 796 N.E.2d 1074, 1078 (Ill. App. Ct. 2003) (citing *McInturff v. Chicago Title & Trust Co.*, 102 Ill. App. 2d 39, 48, 243 N.E.2d 657, 662 (Ill. App. Ct. 1968)). Fowler contends that the government's negligence caused severe injury to his left knee that necessitated his total knee replacement in 2007. He seeks damages to compensate him for his pain, suffering, knee replacement surgery, disability, and loss of a normal life—up to nearly one million dollars. To be entitled to damages of this magnitude, Fowler needs to have proven that the government's negligence was the proximate cause of his need for a knee replacement and current disability. While the foregoing analysis shows that Fowler is not entitled to recover, the Court also finds that he failed to prove that his fall caused the full set of harms for which he seeks damages.

Proximate cause is "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the results would not have occurred." *FDIC v. Bierman*, 2 F.3d 1424, 1434 (7th Cir. 1993). Argument over proximate cause is a familiar area of American jurisprudence. *See, e.g.*, *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). Under Illinois law, the term "proximate cause"

encompasses both "causation-in-fact" and "legal causation." *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 n.1 (7th Cir. 2008) (citing *First Springfield Bank & Trust v. Galman*, 188 Ill.2d 252, 720 N.E.2d 1068, 1072–73 (1999)); *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003) (citing *First Springfield Bank*, 188 Ill. 2d 252, 720 N.E.2d 1068). Causation-in-fact exists where there exists "reasonable certainty that a defendant's acts caused the injury or damage." *First Springfield Bank*, 188 Ill. 2d at 117, 720 N.E.2d at 1072. "A defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury," meaning that the injury would not have occurred absent the negligence. *Id.* Legal causation is about foreseeability, that is, "whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.*

While Fowler proved that his fall caused pain that kept him out of work for seven weeks, his showing did not establish that it is more likely true than not that his fall was the proximate cause of his knee replacement, current disability, and future medical needs. Proximate cause is not established where the causal connection is "contingent, speculative, or merely possible." *Campbell v. United States*, 904 F.2d 1188, 1194 (7th Cir. 1990) (applying Illinois law). While the Court acknowledges that some evidence and testimony presented supports Fowler's causation story, it finds, after careful consideration of the all of the evidence and testimony, that it is more likely that Fowler's need for knee replacement surgery arose from his preexisting medical conditions and that the injury he sustained when he fell at Libertyville resulted only in a temporary aggravation of his pain symptoms, not an acceleration of his osteoarthritis.

At the time of the incident at Libertyville, Fowler already had a long and significant history of knee injury, pain, and severe bilateral osteoarthritis. *See, e.g.*, Tr. 313:1-320:5; 515:21-

519:13; 554:10-19. He acknowledged this history to physicians when he sought medical treatment following his fall at Libertyville, *see, e.g.*, Ex. 1 at Concentra 8, 29-47, and during his testimony at trial, *see* Tr. 313:1-320:5. His prior medical records flesh out a history of arthritic knee pain that was, on numerous occasions, severe and unresponsive to medication. *See, e.g.*, Ex. 3 at Fox 54, 67, 70, 77 (noting, in treatment notes from 1999, Fowler's "severe pain" in the knees and "persistent" osteoarthritis); Ex. 11 at Liberty 21 (reporting results of an MRI done on Fowler's left knee in 2002). The Court credits Fowler's reports that his knee pain worsened immediately following his fall at Libertyville, but is unconvinced that it is more probably true than not that the soft-tissue injury resulting from this fall accelerated the progression of his underlying osteoarthritis or otherwise caused his need for a knee replacement (in 2007, of the left knee, or now, of the right). *Compare* Ex. 5 at Schwager 60-63 (noting Fowler's report of increased knee pain on November 16, 2005), *and* Ex. 1 at Concentra 14-18 (documenting Fowler's post-fall treatment to reduce pain) *with* Tr. 562:16-569:7 (expert testimony that the soft tissue injury Fowler sustained on November 16, 2005, was not a trauma that would cause progression of his osteoarthritis).

Expert testimony by Fowler's surgeon, Dr. Zoellick, is not dispositive in his favor with regard to causation of his knee replacement; indeed, it ultimately did not even prove to be sufficient. "Under Illinois law, to serve as the sole basis for a conclusion that an act was the proximate cause of the plaintiff's injury, an expert must be able to testify with a reasonable degree of medical certainty that proximate cause existed." *Wintz By & Through Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997). Such opinions may not be based on speculation, conjecture, or assumptions about what may have occurred in a particular case. *See*

*Henderson v. Sheahan*, 196 F.3d 839, 852 (7th Cir. 1999); *Reed v. Jackson Park Hosp. Found.*, 325 Ill. App. 3d 835, 844, 758 N.E.2d 868, 876 (Ill. App. Ct. 2001). When asked at trial, however, Dr. Zoellick testified that he could *not* say with a reasonable degree of medical certainty that it is more probably true than not that but for Fowler's fall at Libertyville, he would not have needed knee replacement. Tr. 534:1-6. That is a failure to testify with a reasonable degree of medical certainty that proximate cause existed, at least as to the knee replacement and its subsequent effects on Fowler. His inability in this regard is unsurprising, since Fowler was identified as a candidate for knee replacement in part on the basis of MRI reports dating from *before the incident at Libertyville occurred.* Tr. 319:17-20; 322:17-21; Ex. 5 at Schwager 88-89.

Dr. Finn, by contrast, provided unequivocal testimony that Fowler's fall at Libertyville did not cause any progression in his osteoarthritis. Dr. Finn's testimony is highly credible, given his extensive experience and the complete array of medical records that he consulted. Tr. 552:24-553:23. The Court credits his opinion that Fowler's osteoarthritis was already severe and symptomatic when he fell in 2005, which is consistent with Fowler's medical records, Tr. 561:12-565:19, as well as his opinion that the 2005 fall did not cause Fowler to need a knee replacement, Tr. 572:1-8. Dr. Zoellick offered his opinion that Fowler's fall aggravated his osteoarthritis in his left knee and accelerated its progression without the benefit of having reviewed the medical records and x-rays produced at and around the time surrounding Fowler's 2005 accident. Tr. 508:14-24; 513:21-522:7; 540:10-12. Dr. Stamelos, the orthopedic surgeon who saw Fowler just once, did not consult these records, either; nor did Dr. Horton, who saw Fowler in 2006 for knee pain. Ex. 7 at Stamelos 1; Ex. 6 at Horton 1-2. They are therefore less credible in this case on the condition of Fowler's knee in November 2005, the progression of his

underlying knee problems, and, relatedly, proximate causation of his knee replacement. The Court notes as well that Dr. Zoellick agreed that Fowler's osteoarthritis was already progressing before the accident; in his estimation, it had worsened in severity to a moderate level by 2004 over and above the mild severity he exhibited in 2002. Tr. 485:7-486:15; 488:23-489:3. The fact that he has had his left, but not right, knee replaced, does not in any way establish that that his fall made his left knee worse; the evidence shows that the arthritis in Mr. Fowler's right knee was just as bad as in his left knee, Tr. 575:17-576:8, and that Mr. Fowler's left knee caused him more pain even before the accident, *see, e.g.*, Tr. 290:10-18. Mr. Fowler's osteoarthritis was already progressing rapidly in both knees when he fell and the Court concludes that the evidence is not sufficient to establish by a preponderance that his fall at Libertyville caused its progression to accelerate in the left knee.

At most, Fowler proved that his fall caused pain that gradually resolved until he returned to work. This finding does not entitle him to partial damages, however, because Fowler failed to prove an unreasonably risky condition or breach as required for his claim, and therefore he is not entitled to judgment in his favor.

*     *     *

In conclusion, Fowler has not proven by a preponderance of the evidence that the conditions at the Libertyville Post Office posed an unreasonable risk or that the government breached a duty, and therefore has failed to prove his claim. Accordingly, judgment is entered for the United States and against Fowler.

Date: February 21, 2014

John J. Tharp, Jr.
United States District Judge